IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BLOFSTEIN ET AL.                 :
                                     :     CIVIL ACTION
           v.                   :
                                     :     NO. 17-5578
MICHAEL'S FAMILY RESTAURANT, INC.   :
ET AL.                                   :

**MEMORANDUM**

**SURRICK, J.**                                                  **JULY 19, 2019**

Presently before the Court is Plaintiffs' Unopposed Motion for Final Settlement

Approval. (ECF No. 36.)  For the following reasons, the Motion will be granted.

## I.      BACKGROUND

### A.      Factual Background of Litigation

Michelle Blofstein and Alexis Flores ("Named Plaintiffs") filed this class and collective

action on behalf of themselves and other similarly situated restaurant servers, alleging that

Defendants violated the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and the

Pennsylvania Minimum Wage Act of 1968, 43 P.S. § 333.101, *et seq.* ("PMWA").[1]  Plaintiffs

allege that Defendants permitted servers at four of their restaurants—Country Club Diner,

Tiffany Diner, Warminster West Diner, and Mayfair Diner (first shift)—to work more than 40

hours per week, while maintaining a policy against logging overtime hours on the clock and

maintaining an illegal tip pool.  With regard to the tip pool, Plaintiffs maintain that the servers

were made to pay a fixed amount from their tips to an illegal tip pool to benefit other restaurant

---

[1] Defendants include Michael's Family Restaurants, Inc., Emmanuel Petrogiannis (a/k/a
Mike Petrogiannis), Ioannis Petrogiannis (a/k/a John Petrogiannis), and Nikolaos Petrogiannis
(a/k/a Nick Petrogiannis).  (Am. Compl.)

employees (bussers and food runners), but that the money from the pool was actually used by Defendants to pay these employees' wages and not tips. Plaintiffs filed the class and collective action Complaint on December 13, 2017. (ECF No. 1.) On April 20, 2018, Plaintiffs filed an Amended Complaint, which asserts an additional claim of retaliation on behalf of Named Plaintiff Blofstein. (Am. Compl., ECF No. 16.)

In June 2018, the parties participated in a settlement conference with Magistrate Judge Lynn A. Sitarski. Although no settlement was reached, the parties subsequently engaged in discovery aimed at permitting more informed settlement discussions in private mediation. In July 2018, the parties participated in a private mediation. Again, unable to reach a resolution, they pursued additional discovery and participated in a second full day of mediation with the same mediator in September 2018. At this mediation, the parties reached an agreement to settle Plaintiffs' claims. The Settlement Agreement was signed on November 1, 2018.

**B.     Preliminary Settlement Approval**

Plaintiffs' Unopposed Motion for Preliminary Class and Collective Action Settlement Approval was granted on March 12, 2019. (ECF No 34.) The Order was subsequently amended on March 20, 2019, to reflect a later deadline for class members to submit "opt-out requests, objection requests, and requests to withdraw consent to join." (Am. Order, ECF No. 35.) The Court preliminarily certified two classes: the Settlement Class under the PMWA, and the Settlement Class under FLSA. The PMWA Settlement Class is defined as:

> All current or former Servers who are Pennsylvania residents and who were employed at the Country Club Diner, Tiffany Diner, or Warminster West Diner from December 13, 2014 to July 5, 2018, plus all current or former Servers who are Pennsylvania residents and who were employed during the first shift at Mayfair Diner from December 13, 2014 to July 5, 2018.

(Am. Order ¶ 2.)

The FLSA Settlement Class is defined as:

> All current or former Servers employed at the Country Club Diner, Tiffany Diner, or Warminster West Diner from December 13, 2014 to July 5, 2018, plus all current or former Servers employed during the first shift at Mayfair Diner from December 13, 2014 to July 5, 2018.

(*Id.* ¶ 3.)

After reviewing the settlement terms proposed by the parties, the Court determined that the Settlement Agreement "appears to be the product of serious, informed, and extensive arm's-length negotiations between the Parties and appears to be fair, adequate and reasonable to the Settlement Class so as to fall within the range of possible final approval." (*Id.* ¶ 6.)

### C.    Notice Period and Class Participation

On March 29, 2019, Atticus Administration, LLC ("Atticus") mailed notice of the proposed settlement agreement and claim forms (the "Notice Packet") to the 424 potential class members. (Atticus Decl. ¶ 3, 4, Pls.' Stmt. Mot. Ex. C, ECF No. 36.)[2] Atticus was able to reach 378 of the 424 potential class members. (July 10, 2019 Hr'g Tr. 4, ECF No. 40.) This represents 89 percent of potential class members reached. (*Id.*) The remaining potential class members could not be reached. (*Id.*) Potential class members were notified that the deadline to submit claim forms was May 28, 2019, which was 60 days after the Notice Packets were mailed. (Atticus Decl. ¶ 5.) During this period, the claims administrator received 146 completed claim forms, which represents about 40% of the delivered Notice Packets. (July 10 Hr'g Tr. 4.) There have been no objections to, or requests for exclusion from, the proposed settlement from any proposed class members. (*Id.* at 5.)

The Final Settlement Hearing was held on July 10, 2019. (Min. Entry, ECF No. 39.)

---

[2] Atticus is the settlement administrator for this class action. It handles, among other things, administration of class claims. (Atticus Decl. ¶ 1.)

**D.     The Proposed Settlement Agreement**

Under the Settlement Agreement, Defendants have agreed to pay $750,000 to resolve the litigation.  (July 10 H'rg Tr. 6.)  This amount includes:  (1) approximately $465,000 to pay damages to the Settlement Class members; (2) $15,000 as an award to be split by the Named Plaintiffs for their participation in the litigation; (3) $10,000 to Ms. Blofstein for settlement of her retaliation claim against Defendants; (4) attorneys' fees in the amount of $250,000; and (5) costs in the amount of $10,000.  (July 10 Hr'g Tr. 10.)  Each of the 145 class members will receive a pro rata portion of the of the damages amount based on the number of work weeks that they worked during the class period, as a fraction of the total work weeks by all participating settlement class members.  (Supp. Atticus Decl. ¶ 8, ECF No. 38.)  The calculation is described as follows:

**Individual award = $465,000 x <u>Total weeks worked by participating class member</u>**
**Total weeks worked by all class members**

(Pls.' Stmt. Mot. 4.)  Based upon this calculation, if all claim forms received were to be paid, the total payout is estimated to total $228,034.04, which is 49% of the total $465,000 damage fund.  The highest claim is approximately $4,000 and the lowest claim amount is approximately $22.  (Supp. Atticus Decl. ¶ 8.)  The average claim value to the class member is approximately $1,600.  (*Id.*; July 10 Hr'g Tr. 8.)

The parties informed the Court at the Final Settlement Hearing that Defendants intend to take out a loan in order to fund this settlement.  (July 10 Hr'g Tr. 7.)  This is because Defendants do not have sufficient assets to handle the settlement claims.  (*Id.*)  Defendants' financial situation became relevant during negotiations of this settlement.  (*Id.*)

## II.    DISCUSSION

Our consideration of the proposed settlement will include the following:  (1) whether the proposed PMWA class action meets the requirements of Rule 23 of the Federal Rules of Civil Procedure and is entitled to final certification; (2) whether final certification of the FLSA collective action is appropriate; (3) whether the settlement proposed by the parties is fair and adequate; (4) whether the service payment awards to the Named Plaintiffs and the settlement of Ms. Blofstein's retaliation claim are fair and reasonable; and (5) whether Plaintiffs' request for attorneys' fees and costs merits approval.

### A.    Class Certification of PMWA Class Under Rule 23

Before determining whether the proposed settlement warrants approval, we must first determine whether Plaintiffs have met the elements of final certification of the PMWA class. We previously granted preliminary certification to the PMWA class to include all Pennsylvania residents who were servers at Country Club Diner, Tiffany Diner, Warminster West Diner and Mayfair Diner (first shift) from December 13, 2014 to July 5, 2018.  (Am. Order ¶ 2.)

Class certification under Rule 23 has two components.  The party seeking class certification must first establish the four requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 309 n.6 (3d Cir. 2008).

"If all four requirements of Rule 23(a) are met, a class of one of three types (each with additional requirements) may be certified" under Rule 23(b).  *In re Hydrogen Peroxide Antitrust*

*Litig.*, 552 F.3d at 309 n.6.  Plaintiffs seek certification under Rule 23(b)(3), which states that "[a] class action may be maintained if Rule 23(a) is satisfied and if:  (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  These are known as the predominance and superiority factors of Rule 23(b)(3).

The party seeking class certification "bears the burden of establishing each element of Rule 23 by a preponderance of the evidence."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012).  Certification is only proper "'if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 309 (footnote and quotation marks omitted).

1.  Numerosity

Plaintiffs must first demonstrate that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40," the numerosity requirement "has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).  Plaintiffs have produced evidence demonstrating that there were approximately 424 servers at Defendants' restaurants that qualified as potential members of the PMWA settlement class.  The numerosity requirement is met.

2.  Commonality

Plaintiffs must also demonstrate "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Commonality does not require perfect identity of questions of law or fact

among all class members.  Rather, 'even a single common question will do.'"  *Reyes v.*

*Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564

U.S. 338, 359 (2011)).  This requirement of class certification is easily met.  *Id*.  It is satisfied "if

the named plaintiffs share at least one question of fact or law with the grievances of the

prospective class."  *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013).

Here, questions of fact and law are common to the proposed settlement class.  For

example, issues to be litigated include (1) whether Defendants provided and enforced materially

identical policies and practices relating to the servers' work performance and how they recorded

their time; (2) whether Defendants provided common training, directives, and instructions

relating to their work; (3) whether Defendants had established wages for their servers and the

policies and procedures related to payment of wages; (4) whether servers were paid for any

overtime work; and (5) whether Defendants maintained an invalid tip pool.  These issues are

common to all class members.  In fact, "cases involving wage claims present perhaps 'the most

perfect questions for class treatment.'"  *Altnor v. Preferred Freezer Servs., Inc.*, 197 F. Supp. 3d

746, 756-57 (E.D. Pa. 2016) (quoting *Iglesias-Mendoza v. La Belle Farm, Inc*., 239 F.R.D. 363,

373 (S.D.N.Y. 2007)).  The claims of the settlement class members arise from the same policies

and procedures used by Defendants; therefore, their claims are susceptible to the same common

proof.  *Young v. Tri Cty. Sec. Agency, Inc*., No. 13-5971, 2014 WL 1806881, at *3 (E.D. Pa. May

7, 2014).  The commonality requirement is met.

### 3.   Typicality

Plaintiffs must also demonstrate that the claims or defenses of the representative parties

are typical of the claims or defenses of the proposed class.  Fed. R. Civ. P. 23(a)(3).  A district

court should determine "whether the named plaintiffs' claims are typical, in common-sense

terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006). In addition, "[f]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (citation omitted).

There are two Named Plaintiffs in this class action, both of whom worked as servers for Defendants. Like other members of the proposed class, they allege that Defendants' policies and procedures led to the denial of overtime wages for overtime work and required servers' contribution to an illegal tip pool. Their claims arise out of the same policies and practices as the claims of other members of the settlement class. The incentives of the Named Plaintiffs are aligned with those of the class. The typicality requirement is met.

4.     Adequacy

Finally, Plaintiffs must demonstrate that the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). This requirement concerns both: (1) the "experience and performance of class counsel"; and (2) the "interests and incentives of the representative plaintiff[]." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted). The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Beck*, 457 F.3d at 296 (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). Here, there have been no allegations from either side that the named Plaintiffs have any interests that are incompatible with the class members' interest. In addition, class counsel have very diligently and competently pursued the claims of all class members. The adequacy requirement has been satisfied.

5.     <u>Predominance and Superiority</u>

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem*, 521 U.S. at 614. Rule 23(b)(3), under which Plaintiffs seek final class certification, requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 298 (3d Cir. 2011).

The four factors pertinent to the superiority inquiry are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The predominance requirement is easily met. Plaintiffs contend that Defendants maintained illegal policies and procedures about "off-the-clock overtime work" and maintenance of an illegal tip pool. (Pls.' Stmt. Mem. 12.) Every class member is seeking the same type of relief on the basis of the same legal claims against Defendants. Questions of law and fact common to the class members predominate over questions affecting only individual members.

*See, e.g.*, *Carr v. Flowers Foods, Inc.*, No. 15-6391, 2019 WL 2027299, at *20 (E.D. Pa. May 7, 2019) (finding predominance element met for overtime claims).

The superiority requirement is also met. Even if individual class members had the resources to pursue individual claims against Defendants, the costs of pursuing such claims would likely exceed any recovery. *See Orloff v. Syndicated Office Sys., Inc.*, No. 00-5355, 2004 WL 870691, at *5 (E.D. Pa. Apr. 22, 2004) ("A class action is superior to individual lawsuits by the Class members because it provides an efficient alternative to individual claims, and because individual Class members are unlikely to bring individual actions given the likelihood that their litigation expenses would exceed any potential recovery."). In addition, the class members' interests in having their claims adjudicated through the class action proceeding is revealed by the fact that approximately 40% of class members filed claims, and not one class member objected to the proposed settlement or requested an exclusion.

Accordingly, we are satisfied that final certification of the class under Rule 23 is appropriate. Therefore, we will certify the proposed class for the purposes of settlement approval.

### B.     Final Certification of Collective FLSA Action

Before assessing the fairness of the proposed settlement, we must also determine whether final certification of the collective FLSA action is warranted.

The Third Circuit prescribes a two-step process for certification of collective actions brought pursuant to the FLSA. *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 535 (3d Cir. 2012). At the first step—conditional certification—the plaintiff must make a "modest factual showing," which requires the plaintiff to "produce some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the

manner in which it affected other employees." *Id*. at 536 n.4 (citation and internal quotation marks omitted). On March 12, 2019, we determined that Plaintiffs had made this showing and granted conditional class certification of the FLSA class. (ECF Nos. 34, 35.)

At the second stage of FLSA certification, the district court, "with the benefit of discovery . . . makes a conclusive determination as to whether each plaintiff who has opted into the collective action is in fact similarly situated to the named plaintiff." *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013) (citation omitted); *see also Zavala*, 691 F.3d at 534 ("[A]fter considering the claims and defenses of the parties and all the relevant evidence [the district court] must make a finding of fact that the members of the collective action are 'similarly situated.'"). Plaintiffs have the burden of demonstrating by a preponderance of the evidence that each opt-in plaintiff is similarly situated to them. *Zavala*, 691 F.3d at 534.

In determining whether opt-in plaintiffs are similarly situated, the Third Circuit has adopted the "ad-hoc approach." *Id.* at 536. This approach "considers all the relevant factors and makes a factual determination on a case-by-case basis." *Id*. In using this approach to assess whether plaintiffs are similarly situated, courts look at: "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." *Id*. at 536-537. In addition, opt-in plaintiffs may be considered "dissimilar" if there are "individualized defenses." *Id*. at 537.

Based upon a review of the pleadings, and after consideration of the arguments raised at the Final Settlement Hearing, we are satisfied that the FLSA collective opt-in plaintiffs are similarly situated to the Named Plaintiffs—Ms. Blofstein and Ms. Flores. All Plaintiffs worked in similar positions as servers and under similar terms and conditions of employment with

respect to their overtime and tip pool contributions.  Although the class members worked in four different restaurants, the restaurants were of the same type—diners.  In addition, the servers worked pursuant to similar shifts and schedules at these diners, and for the same wages ($2.83 per hour plus tips).  Finally, the servers were required to abide by the same policies and procedures that required their contribution to an illegal tip pool and prevented overtime wages for overtime work.  Based upon all of these factors, the factual circumstances of the servers comprising the settlement class are more similar than they are different.

## C.    Approval of Settlement Agreement

Rule 23(e) requires a district court to approve any settlement of a certified class before settlement becomes final.  Fed. R. Civ. P. 23(e) ("The claims, issues, or defense of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval.").  "In evaluating a class action settlement under Rule 23(e), a district court determines whether the settlement is fundamentally fair, reasonable, and adequate.  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 592 (3d Cir. 2010) (citing Fed. R. Civ. P. 23(e)).  This is because "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class."  *Id.* at 593; *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) ("Under Rule 23(e), trial judges bear the important responsibility of protecting absent class members, which is executed by the court's assuring that the settlement represents adequate compensation for the release of the class claims." (citation omitted)).

Our inquiry is "even more rigorous" in cases like this one, "'where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously.'"  *In re Pet Food Prod. Liab. Litig.*, 629 F.3d at 350 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004)).  However, the Third Circuit has also

instructed that a presumption of fairness applies where: "(1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016) (internal quotation marks and citation omitted); *see also Altnor*, 197 F. Supp. 3d at 760 n.4 (discussing tension between scrupulous examination and presumption of fairness in ultimately concluding that presumption of fairness was warranted).

We are satisfied that a presumption of fairness is applicable here. First, the parties engaged in extensive arm's-length negotiations. This included both a settlement conference with Judge Sitarski, and two separate full-day mediation sessions with private mediator M. Reid Estes, Jr. Second, the parties engaged in nine months of discovery to assist not only in evaluating the value of Plaintiffs' claims but also to aid in the settlement process. The discovery included numerous discovery requests and responses among the parties, as well as the production of extensive timekeeping and payroll data for the class members and for other restaurant servers for comparison. Discovery also included thousands of documents concerning personnel data, employment records, training and compliance materials, communications, employment dates, rates of pay, and work assignments. Third, class counsel is experienced in state class action and FLSA collective action litigation. Finally, no class members have objected to the terms of the proposed settlement agreement, and no members have sought to be excluded. Therefore, a presumption of fairness attaches. We will nevertheless perform a thorough examination in assessing the fairness, reasonableness, and adequacy of the proposed settlement agreement.

In *Girsh v. Jepson*, the Third Circuit articulated nine factors for district courts to consider in deciding whether a class-action settlement is fair and reasonable:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975) (alterations omitted) (quoting *City of Detroit v. Grinnell Corp*., 495 F.2d 448, 463 (2d Cir. 1974)); *In re Pet Food Prod. Liab. Litig*., 629 F.3d at 350.[3]  We must make findings regarding the *Girsh* factors where appropriate.  *Id.*  "The settling parties bear the burden of proving that the *Girsh* factors weigh in favor of approval of the settlement."  *Id*. (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig*., 55 F.3d 768, 785 (3d Cir. 1995)).

---

[3] The Third Circuit has advised that, in light of the "sea-change in the nature of class actions" since *Girsh*, it may be useful for courts to consider the following factors in addition to the *Girsh* factors:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998).  However, "[w]hile the Court must make findings as to the *Girsh* factors, the *Prudential* factors are merely illustrative of additional factors that may be useful."  *Leap v. Yoshida*, No. 14-3650, 2016 WL 1730693, at *7 (E.D. Pa. May 2, 2016).

### 1. Complexity, Expense, and Likely Duration of the Litigation

"The first factor captures the probable costs, in both time and money, of continued litigation." *Barel v. Bank of Am.*, 255 F.R.D. 393, 400 (E.D. Pa. 2009) (citation and internal quotation marks omitted). The parties have advised the Court that if the proposed Settlement Agreement is not approved by the Court, they would need to undertake additional time-consuming discovery to include additional written discovery requests and numerous depositions. In addition, expert discovery would add further complexity and expense to the litigation. The parties project that this additional discovery would extend the proceedings "well into 2020, or beyond, with substantial fees and costs expended on both sides." (Pls.' Stmt. Mem. 17.) This factor weighs in favor of approving the proposed settlement. *See, e.g.*, *Carroll v. Stettler*, No. 10-2262, 2011 WL 5008361, at *5 (E.D. Pa. Oct. 19, 2011).

### 2. Reaction of the Class to the Settlement

The claims administrator was able to reach 375 of the potential class members to inform them about the proposed settlement. Of those reached, not one class member has objected or sought exclusion from the settlement. This reveals that the class's reaction to the proposed settlement has been overwhelmingly positive. The positive class reaction further supports approval of the proposed Settlement Agreement. *See Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (noting that "only" 29 objections in 281 member class "strongly favors settlement").

### 3. The Stage of the Proceedings and the Amount of the Discovery Completed

"This factor captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had adequate appreciation of the merits of the case before negotiating." *In re Cendant Corp. Litig.*,

264 F.3d 201, 235 (3d Cir. 2001) (citation and internal quotation marks omitted).  As mentioned above, the parties spent approximately nine months in discovery with an aim towards informing their various arguments.  In addition, prior to and after each of the three settlement and mediation conferences, the parties "engaged in a cooperative effort to identify key issues and collect, exchange, and evaluate discovery to inform their positions, including on the value of Plaintiff's claims." (Pls.' Stmt. Mem. 19.)  This factor also weighs in favor of approving the settlement.

        4.      The Risks of Establishing Liability and the Risks of Establishing Damages

"These inquiries 'survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement.'"  *In re Ikon Office Sols., Inc. Sec. Litig.*, 209 F.R.D. 94, 105 (E.D. Pa. 2002) (quoting *In re Prudential Ins. Co.*, 148 F.3d at 319).  The Named Plaintiffs and the other class members faced a risk that they would be unable to establish that they were similarly situated in order to achieve class certification.  In this regard, Defendants would argue that the servers performed their job duties differently, worked under different conditions at the different restaurants, and had different supervisors.  Defendants might also dispute Plaintiffs' allegations that they mishandled the servers' tip pool payments.  Defendants may raise other arguments that present real risks to Plaintiffs' ability to prove liability and damages.  As a result, this factor also weighs in favor of approving the Settlement Agreement.

        5.      The Risks of Maintaining the Class Action through Trial

There will always be a "risk" or possibility of decertification and, consequently, the court can always claim this factor weighs in favor of settlement.  *In re Prudential Ins. Co.*, 148 F.3d at 321.  Therefore, "the manageability inquiry in settlement-only class actions may not be

significant." *Id.* Nevertheless, Defendants would likely oppose certification of the class and could also seek to decertify the class prior to trial. This factor also weighs in favor of approval.

### 6. Defendants' Inability to Withstand a Greater Judgment

The parties represent that Defendants' ability to pay was an issue during settlement negotiations. In particular, the parties notified the Court about the uncertain financial health of Defendants. In fact, at times during the negotiations, Defendants considered filing bankruptcy as an alternative to settling Plaintiffs' claims. Bankruptcy would have stayed all of Plaintiffs' claims and would have significantly delayed and impacted their recovery. Defendants represent that they intend to take out a loan in order to cover the expense of this settlement. Based upon "Defendants' inability to pay an amount larger than the negotiated settlement . . . Plaintiffs had little choice but to accept Defendants' poverty claim and abandon hopes of securing a materially-larger judgment." (Pls.' Stmt. Mem. 21.) The parties agree that Defendants' funding the settlement with a loan, together with the amounts Plaintiffs will receive under the settlement agreement, results in the best possible scenario for both Defendants and Plaintiffs. This factor weighs in favor of approving the settlement.

### 7. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation

The final two *Girsh* factors assess "whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin*, 391 F.3d at 538. "[T]he ultimate test of the value of a settlement in the class context is who gets what and how much." *Id.* Class counsel calculated the maximum value of Plaintiffs' claims to be approximately $2,500,000.00. Defendants not only disputed this value, but also put forth evidence of their precarious financial health and inability to pay that value. Based upon this, the parties agreed to a settlement amount of $750,000, which represents only 30% percent of the Plaintiffs' estimated damages. This

represents a relatively low recovery for Plaintiffs.  However, balanced against the real risk that Defendants would have opted to file for bankruptcy instead of assuming a greater liability, the proposed settlement provides a degree of certainty for those class members who have opted into the agreement that litigation would not.  Therefore, the range of reasonableness of the settlement in light of the possible recovery, the attendant risks of litigation, and Defendants' possible bankruptcy weighs in favor of approving the Settlement Agreement.

Having examined the proposed Settlement Agreement in light of the *Girsh* factors, we are satisfied that the settlement is "fair, reasonable, and adequate."  *Girsh*, 521 F.2d at 157.

### D.    Service Awards to Named Plaintiffs & Award for Retaliation Claim

#### 1.    Service Awards to Named Plaintiffs

As part of the Settlement, the parties request that each of the two Named Plaintiffs receive a service payment of $7,500.  This award is in exchange for the Named Plaintiffs' efforts in bringing and prosecuting this case.  In particular, both Named Plaintiffs actively participated in the case since it was filed in November 2017.  Specifically, they produced documents, assisted with the review of data and documents to inform litigation strategy, communicated with putative class members and encouraged their participation, reviewed pleadings for accuracy, provided declarations, and assisted in the preparations for settlement negotiations.  (Pls.' Supp. Stmt. Mem. 2, ECF No. 37.)  In addition, Named Plaintiffs risked their employment reputation by participating in this class action.  Under the circumstances, the requested service award is appropriate.  *See Leap*, 2016 WL 1730693, at *10; *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) ("Incentive awards are not uncommon in class action litigation and particularly where, as here, a common fund has been created for the benefit of the entire class. In fact, courts routinely approve incentive awards to compensate named plaintiffs for the services

they provided and the risks they incurred during the course of the class action litigation." (internal citation and quotation marks omitted)). Under the circumstances, the awards to the Named Plaintiffs are reasonable and appropriate.

### 2. Award to Blofstein for Retaliation Claim

In addition, the parties have agreed to compensate Ms. Blofstein an additional $10,000 as settlement for her retaliation claims against Defendants.

To establish a claim for retaliation under the FLSA, Ms. Blofstein must show that (1) she engaged in a protected activity, (2) her employer took an adverse employment action against her, and (3) there was a causal link between her protected action and her employer's adverse action. *Little v. Lower Bucks Restoration Servs., Inc.*, No. 17-03446, 2019 WL 936644, at *3 (E.D. Pa. Feb. 26, 2019) (citing *Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936, 939 (3d Cir. 2003)). "[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action" can independently establish causation. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citations omitted). The Third Circuit has explained that temporal proximity is sufficiently close when it is "unusually" or "unduly suggestive," meaning the protected activity occurred very close in time to the adverse action. *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003).

A review of the Amended Complaint reveals that Ms. Blofstein has established her prima facie case of retaliation under the FLSA. Specifically, she alleges that she engaged in a protected activity when she filed an EEOC complaint in June 2017, and that shortly after her complaint, suffered antagonism from her employer, which included cutting her work hours. She further alleges close temporal proximity to support causation. In addition, Ms. Blofstein alleges that Defendants also retaliated against her after the Complaint in this matter was filed. Specifically,

Ms. Blofstein states that, within a month of being served with the Complaint in this matter, Defendants, *inter alia*, harassed her for asserting her rights, made false promises to restore her hours previously lost, failed to offer her extra shifts, refused to seat good-tipping customers to her station, delayed food orders she sent to the kitchen, and failed to properly maintain her requested absences from work. Temporal proximity is also alleged as causation for this act of retaliation. (Am. Compl. ¶¶ 88-93.)

In light of these serious allegations, and in light of the sufficient factual specificity in the Complaint to support her prima facie case, we are satisfied that an award of $10,000 to settle Ms. Blofstein's claims of retaliation is fair and appropriate.

## E.     Approval of Attorneys' Fees and Costs

Under the FLSA, the Court "shall, in addition to any judgment awarded to the plaintiff . . . allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). The Named Plaintiffs request Court approval of attorneys' fees for class counsel in the amount of $250,000, which constitutes one-third (1/3) of the gross settlement amount of $750,000.00. The Named Plaintiffs also request the Court to approve reimbursement of class counsel's out-of-pocket costs, capped at $10,000.

### 1.     Percentage-of-Recovery

In a case such as this, where class members recover from a single common fund, the Third Circuit favors the percentage-of-recovery method in evaluating the fairness of attorneys' fees. *In re Prudential Ins. Co.*, 148 F.3d at 333 ("The percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure."

(citation and internal quotation marks omitted)).  In evaluating the fairness of the requested fees

utilizing this method, we must weigh the following seven factors:

> (1) the size of the fund and the number of persons benefitted; (2) the presence or
> absence of substantial objections by members of the class to the settlement terms
> and/or the fees requested by counsel; (3) the skill and efficiency of the attorneys
> involved; (4) the complexity and duration of the litigation; (5) the risk of
> nonpayment; (6) the amount of time devoted to the case by counsel; and (7) awards
> in similar cases.

*In re Rite Aid Corp. Sec. Litig*., 396 F.3d 294, 301 (3d Cir. 2005) (citing *Gunter v. Ridgewood*

*Energy Corp*., 223 F.3d 190, 195 (3d Cir. 2000)).  "These fee award factors need not be applied

in a formulaic way and in certain cases, one factor may outweigh the rest."  *Id*.

Class counsel contends that all factors favor approval of the requested fees.  With regard

to the first factor, the settlement class members will recover approximately $228,000 of the

$465,000 maximum damages fund proposed, which represents a recovery of about 50% of the

settlement fund.  (July 10 Hr'g Tr. 5.)  Approximately 40% of the class members who received

notice of the proposed settlement filed claims.  Therefore, approximately 40% of the class will

receive approximately 50% of the settlement fund. This factor weighs in favor of approving the

attorneys' fees and costs.  As to the second factor, we note that, among the 378 class members

who received notice about the proposed settlement, not one lodged an objection or sought to opt

out of the settlement.  The third factor likewise weighs in favor of approving the fee award as

class counsel are highly skilled and experienced attorneys who are nationally recognized for

wage and hour class action lawsuits.  The complexity of this case, which includes FLSA claims

and wage and hour claims under Pennsylvania law, supports the requested fee.  As to the fifth

factor, attorneys always risk nonpayment when they accept cases on a contingency fee basis.

Class counsel spent a substantial number of hours to efficiently analyze the claims involved and

negotiate a settlement.  Finally, the requested fee of one-third (1/3) of the gross settlement

amount is reasonable in comparison to awards in other cases. *See Stagi v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 564, 571 (E.D. Pa. 2012) (citing cases and noting that fees in the Eastern District of Pennsylvania range between 19% and 45% in common fund cases).

We are satisfied that the requested attorneys' fees and costs are justified by counsel's successful and efficient resolution of this matter and the significant cash shares for the class members.

### 2. The Lodestar Method

"The Third Circuit has stated that it is sensible for district courts to cross-check the percentage fee award against the lodestar method." *Altnor*, 197 F. Supp. 3d at 766 (quoting *In re Rite Aid Corp.*, 396 F.3d at 305).

> The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys. The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work. The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award . . . . The district courts may rely on summaries submitted by the attorneys and need not review actual billing records.

*In re Rite Aid Corp.*, 396 F.3d at 305-07.

Here, class counsel represents that they have spent a total of 536.1 hours on this litigation and settlement. Based upon the attorneys' standard hourly rates, which range from $175 to $700 per hour, this results in a lodestar figure of $340,997.50. (Supp. Cohen Decl. ¶ 7, Pls.' Supp. Stmt. Mem. Ex. A.) When calculated against the requested fee of $250,000, the lodestar multiplier is .73. This lodestar multiplier is calculated by dividing the attorneys' fees sought by class counsel ($250,000) by the total amount of hours class counsel devoted to the litigation (536.1) times class counsel's hour rates ($175 to $700 per hour). This results in a "negative

multiplier" of .73, which means that class counsel would receive less under a percentage fee award than they would receive using their usual billing rates. *See In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 106 (E.D. Pa. 2013) (explaining the meaning of "negative multipliers"). Lodestar multipliers ranging from one to four are frequently awarded in the Third Circuit. *See Whitman,* 197 F.R.D. at 150. However, when the lodestar is less than one, this "reveals that Class Counsel's fee request constitutes only a fraction of the work they billed." *In re Ins. Brokerage Antit. Litig.,* 579 F.3d 241, 284 (3d Cir. 2009).

The negative lodestar in this case provides additional support for the requested attorneys' fees. Based upon these circumstances, we are satisfied with the reasonableness of the requested fee and we will approve class counsel's request for $250,000 in attorneys' fees. In addition, class counsel is entitled to be reimbursed for their litigation-related expenses in the amount of $10,000.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' Unopposed Motion for Final Settlement Approval will be granted.

An appropriate Order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**